EVELYN BOVEY, as Administratrix of the Estate of JOSEPH E. BOVEY, Deceased, Claimant, *v.* STATE OF NEW YORK, Defendant. (Claim No. 28939.)

WILLIS HICKS, Claimant, *v.* STATE OF NEW YORK, Defendant. (Claim No. 28949.)

Court of Claims, December 8, 1949.

*Leon M. Layden* for Evelyn Bovey, as administratrix, claimant.

*Warren Sears* for Willis Hicks, claimant.

*Nathaniel L. Goldstein, Attorney-General (Arthur W. Mattson* and *Sidney B. Gordon* of counsel), for defendant.

LOUNSBERRY, P. J. These claims arise from an automobile accident which occurred about 8:00 P.M., December 1, 1947, at the junction of the State highway leading easterly from Comstock, in Washington County, with the Slyboro-Middle Granville Road, a county highway. The State highway terminates at this junction and in order for one to proceed to Middle Granville, it is necessary to make an approximately forty-five degree left turn onto the county road. A car operated by the claimant, Willis Hicks, failed to negotiate this turn successfully and crashed into a tree, resulting in injuries to Hicks and in the death of his passenger, Joseph E. Bovey, whose administratrix is also a claimant. The claims were tried together and herewith are decided together.

For a considerable distance before the junction is reached, the State highway, which has a concrete pavement twenty feet wide, is perfectly straight and slightly downgrade. This pavement ends at the county road intersection and, as of the time of the accident, the intersection itself and the county road consisted of a black-top material which was rough and contained holes. It is obvious that such an abrupt termination of the straight, smooth concrete highway and the sharp turn onto the black-top county road would present a considerable hazard unless suitable and sufficient warnings were posted.

As of the time of the accident it was established that three warning devices existed: (1) At a point 500 feet west of the intersection, a sign six feet by eight feet in dimension with black letters on yellow background reading '' Concrete Pavement Ends 500 Feet Ahead — Full Stop Required ''. This sign was placed just outside and above the right-hand guardrail facing eastbound traffic. It was not illuminated or reflectorized in any manner. (2) At the end of the concrete pavement and about eight feet southerly from the right-hand edge thereof was a standard STOP sign twenty-four inches in diameter. Although not all witnesses were in accord on the point, we have found that this sign was reflectorized. (3) Immediately east of the intersection on the east side of the county road, facing eastbound traffic on the State highway, was a yellow and black striped barricade, upon which was placed a double arrow sign pointing northeasterly and southwesterly along the county road and three STOP signs. There is no evidence that either said barricade or the signs fastened thereto were illuminated or reflectorized.

There is some suggestion in the record that another sign existed between the large sign at the 500 foot point and the STOP sign, but the testimony with respect thereto is so vague and uncertain that it must be disregarded.

On the day of the accident claimant Hicks drove to Granville in the afternoon on banking business, after which he made a stop at a tavern, spent some time at his sister's home, made a trip to Middle Granville and then, later, at the request of Bovey, undertook to drive Bovey to North Granville. In North Granville he had some ale at the hotel after which he and Bovey started back to Middle Granville. This time Hicks elected to drive along the State highway above described, upon which he says that he had never before driven. He overtook and passed one car about 1,500 feet from the intersection, continued down the left-hand side of the road, overtook and passed another

about 500 feet from the intersection and continued on the left-hand side until he reached the end of the concrete pavement where, for the first time, he saw the barricade and applied his brakes. He had seen neither the large sign at the 500-foot point nor the STOP sign. He states that he then hit a bump which threw the car; that he attempted to swing left, struck a soft shoulder and ended up against a tree. He assigns as one cause of his trouble an opening in the trees to the north of the barricade, which for a moment he took to be a continuation of the State highway. There was in fact a farm drive leading easterly from the county road at the point of the opening.

There were other causes of his trouble. We are satisfied from the testimony that he was proceeding at a high rate of speed, although the road was unfamiliar to him. His speed when passing the second car was estimated by the driver of that car at between sixty and sixty-five miles per hour. He drove at least a quarter of a mile along the left-hand side of the road. He had heard of the intersection, even though he had never driven the particular route. He was obviously not watching for signs, and did not see the barricade until within about 115 to 120 feet of it, although his lights illuminated, or should have illuminated, the road ahead for at least 300 feet. Such careless manner of driving constitutes negligence which bars recovery, irrespective of any negligence on the part of the State.

In addition, there is evidence that Hicks was intoxicated. He had admittedly done some drinking during the day and an analysis of a urine sample taken from him within an hour after the accident revealed an alcohol concentration of .305%, which is the equivalent of alcohol concentration in the blood of .235%. This, according to recognized scientific standards, indicates intoxication.

The claimants have objected very strenuously to the admission of any evidence with respect to the analysis of the urine and the conclusions to be drawn therefrom. Their first contention is that such evidence would be admissible only under provisions of subdivision 5 of section 70 of the Vehicle and Traffic Law, which so far as pertinent, reads as follows: "Upon the trial of any action or proceeding arising out of acts alleged to have been committed by any person arrested for operating a motor vehicle or motor cycle while in an intoxicated condition, the court may admit evidence of the amount of alcohol in the defendant's blood taken within two hours of the time of the arrest, as shown by a medical or chemical analysis of his breath,

blood, urine, or saliva. For the purposes of this section (a) evidence that there was, at the time, five-hundredths of one per centum, or less, by weight of alcohol in his blood, is prima facie evidence that the defendant was not in an intoxicated condition; (b) evidence that there was, at the time, more than five-hundredths of one per centum and less than fifteen-hundredths of one per centum by weight of alcohol in his blood is relevant evidence, but it is not to be given prima facie effect in indicating whether or not the defendant was in an intoxicated condition; (c) evidence that there was, at the time, fifteen-hundredths of one per centum, or more, by weight of alcohol in his blood, may be admitted as prima facie evidence that the defendant was in an intoxicated condition.''

We agree with the claimants that this section is inapplicable to the present case since there is no indication that Hicks was ever arrested for operating a motor vehicle while in an intoxicated condition. We do not agree, however, that such evidence is, therefore, completely barred. While we have found no New York decision directly in point, we have examined carefully the annotation on the subject of scientific tests for intoxication which appears in 159 American Law Reports at page 209, and have concluded that evidence of such a test and expert opinions with respect to the interpretation thereof, may properly be admitted in civil actions. It is not, however, conclusive on the issue of intoxication, or, at least is not conclusive on the effect which the degree of intoxication found may have had in the particular situation. The State's expert, the Director of the Scientific Laboratory of the New York State Police, could and did state that Hicks was intoxicated according to established scientific standards based on urinalysis, but not having actually seen Hicks at the time, could not and did not state that such intoxication had rendered him unable or unfit to drive a car. Therefore, while we surmise that his condition of intoxication probably had an effect upon his manner of operating the automobile and upon his attention to road conditions and warnings, we are not able to find and we do not find, that such condition was necessarily the cause of the accident.

The claimants secondly contend that since the urine specimen was taken from Hicks while he was in an unconscious condition, the admission of any testimony with respect thereto would be a violation of his constitutional rights against self-incrimination and against illegal searches and seizures. We do not commend the method by which the specimen was obtained but under the rule of *People* v. *Defore* (242 N. Y. 13) it is established that

in this State evidence, although illegally secured, may nevertheless be admitted without violation of such constitutional rights.

We, therefore, deny all of the motions of the claimants to strike out any or all of the evidence based upon the urinalysis.

We have a different situation with respect to the deceased passenger, Bovey. There is no indication that he was in any respect negligent, and we must, therefore, consider whether the State is chargeable with any negligence which contributed to the occurrence of the accident.

It is the duty of the State to post adequate warnings of road conditions and situations which may imperil traffic. Such warnings must afford reasonable notice of the type of condition or situation to be encountered and, so far as possible, should conform to nationally accepted standards. (*Ziehm* v. *State of New York,* 270 App. Div. 876; *LeBoeuf* v. *State of New York,* 169 Misc. 372, affd. 256 App. Div. 798; Vehicle and Traffic Law, § 95-b.)

The signs and warnings employed in the present case failed to meet these requirements. They did not conform to national standards. Except for the stop sign, they were not illuminated or reflectorized. They did not adequately warn as to the situation. A sign reading " CONCRETE PAVEMENT ENDS 500 FEET AHEAD — FULL STOP REQUIRED " gives not the slightest indication that an intersection or even a turn lies ahead. Signs stating that the concrete pavement ends so many feet ahead are common and ordinarily indicate only a change in type of pavement. To be sure, careful reading of this sign would also disclose a full stop requirement, although without any apparent reason, but careful reading at night of an unlighted sign containing so many words and so little useful information cannot be relied upon.

The stop sign was reflectorized, but it was rather distant from the edge of the pavement, and there is some question how squarely it faced traffic. It was smaller than the size considered adequate by national standards and lacked directional arrows. In the absence of other adequate warnings, this sign, which again gave no information as to the type of condition ahead, did not constitute a sufficient warning.

The barrier on the other side of the intersection was probably the most nearly adequate warning employed, but it was unlighted, and like the other devices failed to inform approaching motorists what condition to expect.

A further factor contributing to the dangerous situation was the rough condition of the black-top pavement at the intersection. While this black-top pavement was part of the county road, it formed, by reason of the abrupt termination of the State pavement, a necessary continuation of the State route. This fact the State had recognized by maintaining the intersection for some years. Under such circumstances, we believe that the State had assumed responsibility for its maintenance in a safe condition.

We are of the opinion that the inadequacy of the signs and the rough condition of the intersection were contributing factors in the accident which occurred, and that the death of the passenger, Bovey, may fairly be attributed to the concurrent negligence of the driver and of the State. In such a situation, the liability is joint and several, and recovery may be had against either negligent party. (1 Warren on Negligence, pp. 44, 94, and cases there cited.) In this case his estate has elected to bring its action against the State, and the State, as one of the parties liable, must respond in damages.

The claimants also contend that the State was negligent in the original construction of the highway, principally in failing to bank the turn into the county road. With this contention we do not agree. As was explained by the claimants' expert witness, Grandison G. Underhill, for many years Engineer of Claims for the State Department of Public Works, it was the eventual intention of the State to continue the State highway easterly through the intersection and enter the village of Middle Granville at a different point. The construction of a banked curve at the intersection would have been entirely inconsistent with this plan. While it is unusual for the State to utilize a county road as a continuation of a State route, pending a later extension of the State pavement, there is nothing illegal or improper involved, and the plan taken as a whole was reasonable under the circumstances. The defect was not in the plan or in the construction but in the method of posting warnings and in the maintenance of the intersection. Having undertaken, for however sound reasons, this somewhat unusual construction, necessarily involving a considerable hazard, the State was under a clear duty to take special precaution against mishaps. We have found that it did not take such precautions in an adequate manner, a finding which is reinforced by the evidence submitted of previous similar accidents at the same point. Of course, such evidence is never entirely satisfactory and there is often a question whether it proves the existence of dangerous conditions or merely that there are other negligent drivers. Furthermore, it

can rarely be shown and was not shown in this case that the conditions and circumstances were exactly similar. Nevertheless, upon the whole, we feel that sufficient similarity was shown to reinforce the conclusion that a hazardous condition did exist and that sufficient warning was lacking.

Joseph E. Bovey, at the time of his death, was twenty-six years of age and had a life expectancy of 38.11 years. His wife, Evelyn Bovey, was twenty-eight years of age and had a life expectancy of 36.73 years. He left surviving him, in addition to his wife, Evelyn Bovey, three children aged six, three and one years. His gross earnings at the time of his death were $35 per week. For the wrongful death of the said Joseph E. Bovey, we make an award for damages in the amount of $15,000, together with funeral expenses and burial lot amounting to $254.50, and with interest on the total award from December 1, 1947.

Findings in accordance with the within opinion may be submitted within fifteen days from the date of the filing hereof, otherwise the opinion will be considered the decision herein.

Let judgment be entered accordingly.