JOAN M. QUIGLEY, as Administratrix of the Estate of CHARLES J. QUIGLEY, Deceased, Claimant, *v.* STATE OF NEW YORK, Defendant. (Claim No. 30521.)

JOAN M. QUIGLEY, Claimant, *v.* STATE OF NEW YORK, Defendant. (Claim No. 30522.)

Court of Claims, December 14, 1951.

*Nathan M. Medwin* and *Philip R. Murray* for claimant.

*Nathaniel L. Goldstein, Attorney-General (James G. Austin* of counsel), for defendant.

LOUNSBERRY, P. J. These two claims arise from an unfortunate automobile accident which claimed the life of Charles J. Quigley and seriously injured his wife, Joan M. Quigley.

On December 23, 1949, at around 8:00 P.M. the decedent, accompanied by his wife, was driving his car easterly along State Highway Route No. 44, enroute to Pittsfield, Massachusetts, from their home in New Jersey. About a mile and a half west of Amenia, at a location known as Fish Hatchery Hill, the car approached a curve and downgrade. In the words of Mrs. Quigley, "We were travelling about 25 or 30 miles an hour,— we approached a curve, and from nowhere there was some ice because Mr. Quigley had trouble keeping the car on the road * * * we started to skid and he tried to control it, and something from the left side kept pulling. We felt a jar and he completely lost control of the car." The car crossed into the left lane and collided with a car coming from the opposite direction.

That is substantially all of the evidence available as to what occurred. The rest is left to inference.

In the vicinity of the accident the highway ran along a side-hill, with a wooded embankment and rock cut rising above it on the south side, and a downslope on the north side. The curve was to the right and described by claimant's engineer, G. G. Underhill, as "sharp" and by State Trooper McGuire as "blind". It occurred on a downgrade of generally 7%, extending at least 700 feet westerly from the scene of the accident, although at the point of accident the grade decreased to around 1.40%. Beginning about 250 feet westerly from the point of the accident and proceeding easterly, the curve was banked from north to south, on "a very material slope" according to Mr. Underhill. Along 150 to 200 feet of the banked section the north shoulder was elevated from three to six inches above the pavement level.

Westerly from the place of the accident, about 100 feet according to Mr. Underhill, and about twenty feet according to Deputy Sheriff Dunbar, there existed a separation between the north and south slabs of the concrete pavement, averaging three inches in width, three to four inches in depth, and seventeen feet in length. In the same vicinity the south slab had settled from one to one and a half inches below the north slab, for a distance of seventy-two feet.

The evidence as to road and weather conditions is somewhat conflicting. Mrs. Quigley testified that the road was dry, and the weather very clear at the time of the accident. Deputy Sheriff Adams, who drove at high speed easterly from Poughkeepsie to investigate the accident, had no trouble with slippery pavements until he approached the curve, and found the pavement generally dry. Trooper McGuire, also proceeding easterly at about the same time, encountered several sections where the road was covered with ice, snow and slush, but stated that it was dry for a half mile westerly from the scene of the accident. Deputy Sheriff Dunbar, coming westerly from Amenia, found ice on one hill but the road otherwise practically dry until he was within one hundred yards of the scene. Weather records taken at the airport at Poughkeepsie, some twenty miles to the west, show rain, some sleet and a little snow during the day, ending at 6:25 P.M. No evidence was submitted, however, proving that any of these conditions had prevailed in the vicinity of Fish Hatchery Hill.

There was unquestionably a patch of ice across the road at the point of collision. According to Trooper McGuire, it extended twelve feet and seven inches westerly from the rear bumper of the Quigley car, in the north lane, and in the south

lane an additional fifty to twenty feet westerly toward the rock cut. There is also a considerable possiblity that there was additional ice a little farther west on the curve, in the vicinity of the pavement separation and settlement. State's Exhibit " U ", a photograph taken the day after the accident, purports to show ice patches on the pavement about 100 feet west of .the point of collision, which were evidently visible to the State photographer although they are not very clear in the picture. Deputy Adams testified that as he approached the curve from the west he encountered a glazy surface before reaching the actual scene of the collision. It is interesting to note, also, that another photograph, claimant's Exhibit 15, while taken a week later and therefore not evidence of conditions the day of the accident, shows a distinct ice patch in the south lane at a point apparently about 100 feet west of the scene, on an otherwise apparently dry pavement.

In the light of the testimony of Deputy Sheriffs Dunbar and Adams and Trooper McGuire, there is little doubt that this section of road had been known for a considerable period of time to be frequently wet or icy on occasions when the rest of the highway was dry. The State had apparently recognized the existence of such a condition, for at a point 1,100 feet to the west it had erected a large " CAUTION — PAVEMENT SLIPPERY WHEN WET " sign. There was also evidence of another accident in the same vicinity about three months earlier. At least constructive notice to the State seems therefore well established.

The cause of the condition is nowhere satisfactorily explained however. Some of the witnesses attributed it to seepage from the rock cut on the south side. To reach the pavement, however, water seeping from the cut would have to cross a ditch along the south side of the pavement and then apparently flow uphill, the pavement being banked from north to south. It is very possible that the ditch may have been blocked, and that the pitch of the bank of the curve was less sharp at this point, the grade having reduced from 7% to 1.40%, a combination of circumstances which could explain a flow of water onto the pavement, but the record is devoid of the necessary evidence to support this speculation. It is also possible that water may have seeped through the pavement separation, but again the record is devoid of supporting evidence.

Mr. Underhill disregarded the seepage theory and instead attributed the ice condition to surface water confined to the pavement by the raised north shoulder. The court is unable

to follow this explanation, however, since any water on the banked pavement would naturally flow downgrade southerly and easterly, not uphill northerly, no matter what the condition or slope of the north shoulder. Furthermore, as above pointed out, there is no proof of rainfall at that point the day of the accident.

Since, therefore, the cause of the condition remains undetermined, it obviously cannot be charged to any particular act or neglect of the State. Freedom from liability is not thereby established, however. Being aware of the situation, the State should have taken steps to alleviate it, or at least to give proper warning of it. There is no evidence that anything was done or attempted in the way of alleviation, and there is no evidence of warning other than the " CAUTION — PAVEMENT SLIPPERY WHEN WET " sign above described.

It is now firmly established that the State must post warnings of dangerous road conditions, that these warnings must give reasonable notice of the type of condition to be encountered, and, so far as possible, must conform to nationally accepted standards. (*Karl* v. *State of New York,* 279 N. Y. 555; *Ziehm* v. *State of New York,* 270 App. Div. 876; *Dawley* v. *State of New York,* 186 Misc. 571; *Bovey* v. *State of New York,* 197 Misc. 302.) Here we feel the State's performance was deficient. The curve and grade were strikingly similar to those in *Piragnoli* v. *State of New York* (Claims Nos. 30059, 30202) decided by this court October 8, 1951, except that in the *Piragnoli* case the additional complications of an ice condition and a pavement separation were not present. In that case we found the State negligent for posting only an old type nonreflectorized curve warning sign and in failing to post a standard reflectorized curve sign together with a hill warning sign. In the present case the State posted no curve or hill warning signs whatever. The only warning sign was clearly inadequate to describe the curve, grade, and possible ice condition ahead. In fact, it was inadequate to warn even of the ice condition alone, since by its terms it applied only when the pavement was wet, and here the pavement was dry for at least a half mile ahead of the ice area. A driver would naturally disregard such a sign unless the pavement was in fact wet. The net result was that there was no effective warning at all of the dangerous highway condition.

The pavement separation and depression above described certainly constituted defective maintenance on the part of the State. (*Crane* v. *State of New York,* 257 App. Div. 699; *Cook* v. *State of New York,* 301 N. Y. 780.) Their causal relation to

the accident is debatable, but from Mrs. Quigley's description of the pulling from the left and the sudden jar it may reasonably be inferred that they were at least contributing factors.

The State points out that the ice patch described by Trooper McGuire extended only a short distance westerly from the scene of the collision and argues that the events described by Mrs. Quigley could not possibly have occurred within so short a distance. It seeks to conclude therefrom that this particular ice patch was not at all the cause of the accident and that the true cause was a skid on a slippery surface farther to the west resulting from the rainfall shown on the Poughkeepsie weather report. The difficulty with this argument is that it is speculative, that it assumes a rainfall not proved in the location of the accident, and that it ignores the likelihood that the particular ice patch in question, even if not the whole cause of the accident, was very probably at least a substantial contributing factor. It was undoubtedly the skid on this ice patch which finally precipitated the Quigley car into the north lane of the highway.

We have reached the conclusion, therefore, that there existed in the area of the accident a dangerous highway condition of which the State had, or should have had, knowledge; that the State failed either to remedy the same or to give adequate warning thereof; that such condition, coupled with the failure to give warning, was the cause of the accident; and that the State is liable in damages therefor. The record is entirely devoid of any evidence of contributory negligence on the part of either Mr. or Mrs. Quigley.

Charles J. Quigley had an exceptionally promising future. He had been a high honor student in secondary school and college, had served ably in the armed forces, was well developed physically, and at the time of his death was employed by Radio Corporation of America as an electrical engineer in a specialized training program preliminary to study for a master's degree, with a net salary, after deductions, of $58 per week. He was twenty-four years of age and had a life expectancy of 39.49 years. For his wrongful death we award $25,000, together with funeral expenses of $1,178, and with interest on the total amount of $26,178 from December 23, 1949 (date of death of decedent herein) to August 17, 1950 (six months after appointment of administratrix on February 17, 1950) and from October 26, 1950 (date of filing of claim) to date of entry of judgment.

Mrs. Quigley sustained a variety of severe and painful injuries, including a scalp wound, an injury to the left eye, an injury to the left hand, fractures of the collarbone, a rib, comminuted fractures of the antrum and of the jaw. The malar bone was driven into the superior maxilla reducing the cavity of the antrum by about one half. She was hospitalized for about four weeks, was under medical care for considerable time, and suffered from shock, nervous conditions, anemia, and severe pain. She also contracted jaundice, apparently resulting from blood plasma injections. It was necessary to extract three teeth and replace them with a partial plate. The injuries to the left side of the face are permanent and have resulted in a definite disfiguring indentation thereof. There has also resulted recurring headaches and pain in the face, which in the opinion of a specialist are permanent. We conclude that she is entitled to an award of $10,000 for her pain, suffering and permanent injuries, together with medical and hospital expenses totalling $680.46.

Findings in accordance with this opinion may be submitted within fifteen days from the filing hereof; otherwise, this memorandum will be considered the decision.

Let judgment be entered accordingly.